IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ABDULRAHMAN ODEH, | § | |
| MUFID ABDULQADER, | § | |
| GHASSAN ELASHI, | § | Civ. No. 3:13-CV-4299-P |
| MOHAMMAD EL-MEZAIN, | § | Civ. No. 3:13-CV-4300-P |
| SHUKRI ABU BAKER, | § | Civ. No. 3:13-CV-4301-P |
| Petitioners, | § | Civ. No. 3:13-CV-4302-P |
| V. | § | Civ. No. 3:13-CV-4303-P |
| | § | Crim. No. 3:04-CR-0240-P |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Petitioners' motions to vacate, set-aside, or correct sentence

pursuant 28 U.S.C. § 2255.  For the foregoing reasons, Petitioners' motions are denied.

## I.  Procedural Background

On July 26, 2004, a grand jury returned a multiple count indictment against Petitioners

Abdulrahman Odeh, Mufid Abdulqader, Ghassan Elashi, Mohammad El-Mezain and Shukri Abu

Baker.  (*See* Indictment, ECF No. 1.)[1]  The superceding indictment charged Petitioners with

conspiracy to provide material support to a foreign terrorist organization (i.e., Hamas), in

violation of 18 U.S.C. § 2339B(a)(1) (Count 1); providing material support to a foreign terrorist

organization, in violation of 18 U.S.C. § 2339B(a)(1) (Counts 2-10); conspiracy to provide funds,

goods, and services to a Specially Designated Terrorist (i.e., Hamas), in violation of 50 U.S.C. §§

1701-1706 (Count 11); providing funds, goods, and services to a Specially Designated Terrorist,

---

[1]All document numbers refer to the docket number in the underlying criminal action
unless otherwise noted.

in violation of 50 U.S.C. §§ 1701-1706 (Counts 12-21); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 22); substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 23-32), and forfeiture of assets and certain other tax offenses not relevant to this petition. (Superseding Indictment, ECF No. 233.) *See generally United States v. El-Mezain*, 664 F.3d 467, 485-490 (5th Cir. 2011) (setting forth detailed procedural and factual history of the case).

On July 24, 2007, the case went to a jury trial before the Honorable A. Joe Fish. The jury acquitted El-Mezain on all counts except Count 1 (conspiracy to provide material support to a foreign terrorist organization) and hung on all counts as to all other Petitioners. The case was then reassigned to this Court. On August 29, 2008, the government dismissed all charges against Odeh and Abdulqader except for the three conspiracy counts (Counts 1, 11 and 22) (ECF No. 1161.) On September 22, 2008 the case was tried before a jury. On November 24, 2008, the jury convicted all Petitioners on all applicable charges. (ECF No. 1250.) On May 27, 2009, the Court sentenced Baker and Elashi to 65 years in prison, Abdulqader to 20 years in prison, and Odeh and El-Mezain to 15 years in prison.

Each Petitioner filed a direct appeal. On December 27, 2011, the Fifth Circuit Court of Appeals unanimously affirmed the convictions and sentences. *El-Mezain*, 664 F.3d at 484. On February 17, 2012, the Fifth Circuit denied Petitioners' petitions for rehearing en banc. On October 29, 2012, the Supreme Court denied certiorari.

On October 25, 2013, Petitioners filed the instant § 2255 petitions. They argue:

1.     They received ineffective assistance of trial counsel;

2.     They received ineffective assistance of appellate counsel;

3.      They are actually innocent;

4.      The government suppressed exculpatory evidence;

5.      The Fifth Circuit engaged in an improper harm analysis resulting in a denial of

        due process; and

6.      The prosecution was brought against Petitioners for improper purposes resulting

        in a denial of due process and equal protection.

Petitioner Odeh also filed separate additional grounds for relief. He argues:

1.      He received ineffective assistance of trial counsel when counsel provided

        incorrect advice regarding a plea offer;

2.      He received ineffective assistance of trial counsel when counsel cross-examined

        witnesses; and

3.      He received ineffective assistance of appellate counsel when counsel failed to

        argue the evidence was insufficient to convict him of the charges.

## II.  Factual Background

        The following factual background is taken from the Fifth Circuit's opinion on direct

appeal.

        The charges arose after many years of widespread surveillance conducted pursuant
to the Foreign Intelligence Surveillance Act ("FISA") of several individuals and of the
Holy Land Foundation for Relief and Development ("HLF"). Until it was closed by the
Government in 2001, HLF was a pro-Palestinian charitable organization based in
Richardson, Texas. Individual defendants Shukri Abu Baker, Ghassan Elashi, and
Mohammad El-Mezain served as officers and directors for HLF. Defendant
Abdulrahman Odeh managed HLF's New Jersey office, and Defendant Mufid
Abdulqader was a speaker and performer who appeared at HLF fundraising events.

        HLF held itself out to be the largest Muslim charity in the United States,
ostensibly with the mission of providing humanitarian assistance to needy Palestinians

living in the Israeli-occupied territory of the West Bank and Gaza. The Government charged that in reality HLF's mission was to act as a fundraising arm for Hamas, also known as the Islamic Resistance Movement, and to assist Hamas's social wing in support of Hamas's goal to secure a Palestinian Islamic state in what is now Israel. The indictment charged the defendants with assisting Hamas by funneling money to certain "zakat" committees located in the West Bank. Zakat committees are charitable organizations to which practicing Muslims may donate a portion of their income pursuant to their religious beliefs, but the Government charged that the committees to which the defendants gave money were part of Hamas's social network.

. . . .

The defendants raised money through HLF by conducting nationwide fundraising events, conferences, and seminars where HLF sponsored speakers and solicited donations. . . . Prior to 1995, the individual defendants and HLF more or less openly supported Hamas. Then, after Hamas was designated as a terrorist organization, the defendants' support became less obvious. Speakers and performers at HLF fundraising events no longer openly referred to Hamas even though HLF continued to support the same zakat committees that Hamas controlled.

From 1992 to 2001, HLF raised approximately $56 million in donations. The Government charged that from 1995 to 2001, HLF sent approximately $12.4 million outside of the United States with the intent to willfully contribute funds, goods, and services to Hamas.

. . . In September 1993, Yasser Arafat, the leader of the Palestine Liberation Organization ("PLO"), and Israeli Prime Minister Yitzhak Rabin signed what became known as the Oslo Accords. These accords established mutual recognition between the Israeli government and the Palestinians, known as the Palestinian Authority ("PA"). As a political rival of Arafat and his Fatah political party, Hamas opposed the Oslo Accords. One month after the Oslo Accords were signed, Defendants Baker and Elashi, and possibly Abudlqader, participated in a meeting at a Philadelphia hotel ("the Philadelphia meeting") that was secretly recorded by the FBI. The meeting participants . . . discussed their opposition to the Oslo Accords, their desire to derail the peace process, and their continued support of Hamas. Statements from Baker suggested an aura of deception and an intent to hide a connection to Hamas. . . .

Beginning in approximately 1994, Government surveillance on the defendants included wiretaps on the telephones and facsimile machines of HLF, Baker, El-Mezain, and Abdulqader. In addition to the wiretaps, the Government conducted searches at the homes of two unindicted co-conspirators, Ismail Elbarasse and Abdelhaleen Masan Ashquar, who had also participated in the Philadelphia meeting. The searches yielded numerous documents corroborating the creation of the Palestine Committee and its

oversight of HLF as a fundraising arm for Hamas. . . .

In January 1995 the President issued Executive Order 12947, designating Hamas as a Specially Designated Terrorist ("SDT"). The designation prohibited financial transactions with or for the benefit of Hamas and authorized the Treasury Department to block assets within the jurisdiction of the United States in which Hamas had an interest. . . . Hamas was further designated as a foreign terrorist organization (FTO") by the State Department in 1997. . . .

On December 3, 2001, pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* ("IEEPA"), the United States designated HLF as a SDT. The next day, the Treasury Department's Office of Foreign Assets Control ("OFAC") issued a blocking order on HLF's assets. On that same day, OFAC entered HLF's offices in Texas, New Jersey, Illinois, and California, and seized physical property. The seizure was conducted pursuant to the authority of IEEPA; no judicial warrant was obtained. In April 2002 the FBI sought, and was granted, a warrant from a magistrate judge to search the property that OFAC had seized. Evidence from that search was used at trial. A search was also conducted at Infocom, where the FBI seized more of HLF's documents and records.

At trial, the Government's evidence was voluminous and came from a variety of sources, including the above seizures, wiretaps, and financial documents. It also included evidence seized by the Israeli military from the zakat committees and from the PA's headquarters in Ramallah. The key issues addressed by the evidence were the connection between the defendants and Hamas, and Hamas's control of the zakat committees. . . .

. . . .

The defendants' theory at trial largely was that they did not support Hamas or terrorism, but rather shared a sympathy for the plight of the Palestinian people through support of the zakat committees and the charitable work the committees performed. Their view was that the Government never designated as a terrorist organization any of the zakat committees or anyone connected to the committees. They argue that the Treasury Department had to designate a zakat committee before contributions to it would be unlawful, suggesting that non-designated committees were not controlled by Hamas.

The jury rejected the defense's theories and credited the Government's evidence by finding each defendant guilty of all applicable charges. The district court imposed sentences ranging from 65 years for Baker and Elashi, to 20 years for Abdulqader, and 15 years for Odeh and El-Mezain. . . .

*El-Mezain*, 664 F.3d at 485-490.

Page 5

### III.  Discussion

**1.      Ineffective Assistance of Counsel**

Petitioners claim they received ineffective assistance of trial and appellate counsel.  To

sustain a claim of ineffective assistance of counsel, a petitioner must show that: (1) counsel's

performance was deficient; and (2) the deficient performance prejudiced the defense so gravely

as to deprive the petitioner of a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In

*Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly

deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight."

*Strickland*, 466 U.S. at 689.  Courts, therefore, must "indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance."  *Id.*

Even if counsel is proven deficient, a petitioner must prove prejudice.  To prove such

prejudice, the petitioner must show "a reasonable probability that the result of the proceedings

would have been different but for counsel's unprofessional errors."  *Crane v. Johnson*, 178 F.3d

309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694).  "[T]he mere possibility of a

different outcome is not sufficient to prevail on the prejudice prong."  *Id.*  "Rather, the defendant

must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'"

*Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

####       A.      Failure to challenge government witnesses

Petitioners argue trial counsel inadequately challenged the factual basis for three

government witnesses' claims that Hamas controlled the zakat committees listed in the

indictment. (Pet'rs' Joint Mem. at 7.)

The government called two expert witnesses and an HLF representative who testified that

Hamas controlled the zakat committees listed in the indictment. The first expert, Avi, was a legal advisor for the Israeli Security Agency.[2] The second expert was Dr. Matthew Levitt, who was an expert on the subject of Hamas. The third witness, Mohamed Shorbagi, was an HLF representative who worked in Georgia to help raise funds for HLF. Contrary to Petitioners' assertions, defense counsel, in both the *Daubert* hearings and at trial, vigorously challenged the factual basis and reliability of these witnesses' opinions.

#### (i)   Avi

Avi testified that he specialized in the structure of the social branch of Hamas and its financing methods. (Trial Tr. Vol. 25 at 168.) He testified Hamas not only controlled the zakat committees, but that the committees were part of Hamas. (Trial Tr. Vol. 29 at 48.)

The record shows defense counsel extensively challenged the basis for Avi's knowledge and conclusion that Hamas controlled the zakat committees. On direct appeal, the Fifth Circuit considered defense counsels' cross-examination of Avi.[3] The Court stated:

> The defense highlighted for the jury the fact that Avi was testifying under an assumed name and that defense counsel could not research him or verify his opinions. Defense counsel elicited from Avi the fact that he had never been to a zakat committee or spoken to people who had received assistance from the committees, he had not been involved with the seizure of evidence from the committees, and he had not polled Palestinians about the zakat committees. The defense also asked about Avi's work product and the materials he relied upon in reaching his opinions. The defense challenged Avi's credibility on the subject of Hamas control of the zakat committees, as well as the basis for his knowledge, by (1) eliciting the fact that no Hamas materials were found in the offices of certain zakat committees that Avi claimed were controlled by Hamas, (2) asking whether he knew that the United States Agency for International Development ("USAID"), a government organization, had given money to and visited a committee that

---

[2]The name "Avi" was a pseudonym. Avi's real identity was not disclosed.

[3]The Fifth Circuit analyzed defense counsels' cross-examination of Avi in reviewing Petitioners' claim that the trial court erred in allowing Avi to testify under a pseudonym.

Avi testified was allegedly controlled by Hamas, (3) showing him statements in government exhibits that indicated a lack of Hamas presence in zakat committees that he said were controlled by Hamas, and (4) asking him questions to demonstrate a lack of knowledge about the internal election proceedings of the zakat committees.

*El-Mezain*, 664 F.3d at 492-93.

Defense counsel also elicited from Avi that there were non-Hamas members on the zakat committees, and that most of the aid dispersed by the zakat committees did not go to families of suicide bombers or Hamas activists killed by Israelis. (Trial Tr. Vol. 28 at 166-67, 180; Pet'rs' Joint Mem. at 36.) Defense counsel also extensively questioned the reliability of the sources Avi used for his conclusions. Petitioners' ineffective assistance claim regarding Avi's testimony is without merit.

### (ii)  Matthew Levitt

The government called Matthew Levitt as an expert on the subject of Hamas. Levitt identified certain zakat committee members as Hamas, and testified that Hamas controlled many of the zakat committees in the West Bank and Gaza. *El Mezain*, 664 F.3d at 489, 533-34. During the *Daubert* hearing and at trial, defense counsel challenged the basis of Levitt's knowledge and the reliability of the sources underlying his opinion by challenging Levitt's use of newspaper articles, wire services, press releases, criminal indictments, and possibly biased Israeli sources. (*See generally*, Transcript July 23, 2007 *Daubert* hearing on Joint Mot. to Exclude Government's Proposed Experts at 10-25 (ECF No. 582) and May 30, 2008 renewal of motion (ECF No. 1036); Trial Tr. Vol. 7 at 203-238). Further, at trial, defense counsel elicited testimony that Levitt had not visited any zakat committees, that he did not speak Arabic, and that a Senior Harvard Research Scholar had criticized his research methods as being based on assumptions and

generalizations. (Trial Tr. Vol. 7 at 139-45, 203-239; Trial Tr. Vol. 8 at 44.) Petitioners have failed to show they received ineffective assistance of counsel regarding Levitt's testimony.

### (iii)   Mohamed Shorbagi

Petitioners argue counsel was ineffective for failing to adequately object to the testimony of HLF representative Mohamed Shorbagi. Shorbagi pled guilty in a separate case to providing material support for Hamas through HLF, and he testified in this case as part of a plea agreement. Petitioners argue Shorbagi "had no basis for his claim that Hamas controlled the Zakat Committees." (Pet'rs' Joint Mem. at 8.)

The record shows trial counsel repeatedly objected to Shorbagi's lack of personal knowledge regarding Hamas's control of the zakat committees and also argued that Shorbagi's testimony was hearsay. (Trial Tr. Vol. 20 at 4-8; 36-43; 70-72.) Appellate counsel also raised these claims on direct appeal. The Fifth Circuit agreed that Shorbagi's testimony on this issue was hearsay, but held that its admission was harmless error. *El Mezain*, 664 F.3d at 497- 98. Petitioners have failed to show defense counsel inadequately challenged Shorbagi's testimony, and that they suffered the required *Strickland* prejudice.

### B.     Affidavits from Zakat Committee Members

Petitioners claim defense counsel were ineffective for failing to present testimony from members of the zakat committees who would have testified that Hamas did not control the committees. Petitioners argue this evidence "would have conclusively established that Hamas did not control these Zakat Committees." (Pet'rs' Joint Mem. at 8.)

Petitioners submit affidavits from a number of people who state they were members of the zakat committees named in the indictment during the relevant time period, and that Hamas

did not control the zakat committees. (Pet'rs' Joint Mem. at 9.) None of these witnesses, however, state they were willing and able to testify at trial in Dallas, Texas.[4] *See Alexander v. McCotter*, 775 F.2d 595, 602-03 (5th Cir. 1985) ("In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial."); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (stating that despite expert's affidavit rebutting much of the state's medical testimony, the affidavit did not state that the expert "was available to testify at trial, that he would have done so, or that he would have testified in accordance with the opinions and conclusions he states in his affidavit."); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (finding witness affidavits insufficient to show *Strickland* prejudice where witnesses failed to state they were available to testify at trial and would have done so); *Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting *Woodfox*, 609 F.3d at 808) ("[T]he seemingly technical requirements of affirmatively showing availability and willingness to testify are not a matter of formalism. Rather, a petitioner must present evidence on these points as part of proving trial

---

[4]Some of the witnesses state in their affidavits that they were "always willing" to provide their testimony, but they do not state they were willing to travel to Dallas, Texas for trial, nor do they state they had the required travel documents. *See* Affidavits of Abd-El Azez Magames, Abd-El Azez Saafen; Walid Abdullatif Solayman Abu Libdeh; Hashem Sadek Abd El Fattah Alnatshen, Ghayyat Raafat Hafez Khairy, and Riyad Rashid Hamad Walwil (ECF No. 27 in Cause No. 3:13-CV-4299-P); Shaban Mohammed Salem Abu-Atten, Hilwa Azmi Mohammad Hermas, Walid Khaled Ibrahim Jarror and Yasin Ahmad Al-Saadi (*Id*. at ECF No. 28); Hamzeh Theeb Mustafa Abu-Sbaiha, Ammar Tawfik Ahmad-Badawi Khojiyyeh, also spelled as Ammar Tawfiq Ahmad-Badawi Ayyoub and Muhammad Eed Muhammad Mesh (*Id*. at ECF No. 36). Three witnesses stated that "if proper assurances can be made" they are currently willing to travel to the United States to provide their testimony. *See* Affidavits of Bilal Khamis Yusef Abu-Sofirah, Adli Rifaat Salih Yaesh, and Abd Al Rahin Mohammad Radi Taha Hanbali (*Id*. at ECF No. 36). These witnesses do not state what is required as a "proper assurance" for their testimony.

counsel could have found and presented a favorable [witness].").

Additionally, Avi testified that although it is common knowledge among the Palestinians that Hamas controls these zakat committees, the committees conceal this fact from entities, like the United States, that believe Hamas is a terrorist organization. (Trial Tr. Vol. 29 at 7-8.) Jurors may therefore have discounted these witnesses' testimony that Hamas did not control the zakat committees.

Further, defense counsel attempted to call witnesses from the zakat committees at trial, but counsel stated the witnesses were unavailable to testify in the United States. In their motion for Fed. R. Crim. P. 15 depositions of these witnesses, defense counsel stated:

> Witnesses in this case are concerned about their physical safety should they testify and also about the prospect of United States governmental action against them. Many foreign defense witnesses face the prospect of arrest, subpoena, or other process by the United States government if they enter this country. . . . In addition, . . . many foreign defense witnesses harbor a more generalized fear of harassment by the United States should they testify in this country on behalf of these defendants. It is well-known in the Palestinian territories that the United States government has designated a number of foreign nationals, including persons not apprehended in Afghanistan or Pakistan, as "enemy combatants" and has detained them at Guantanamo Bay Naval Station. At least two Guantanamo detainees are known to be Palestinian. Under these circumstances, foreign defense witnesses are unwilling to travel to the United States to testify on behalf of the Defendants. In addition, serious logistical impediments exist for some of the witnesses to receive permission to enter the United States, or even to leave their own locales. The absence of a foreign witness who travels to the United States to testify in an American court will not pass unremarked when he returns to his home and may generate negative attention.

(Motion at 6-7) (ECF No. 327, reurged at ECF No. 1036).

Finally, given the "substantial" evidence of Hamas's control of the zakat committees, *El-Mezain*, 664 F.3d at 489, Petitioners have failed to show that but for counsels' failure to call these witnesses, there is a reasonable probability that the outcome of the trial would have been

different.

### C.   Professor Nathan Brown

Petitioners argue defense counsel was ineffective for failing to call Professor Nathan

Brown as an expert witness.  Professor Brown testified in the first trial, and Petitioners claim "he

was the best, most effective witness from the first trial." (Pet'rs' Joint Mem. at 10.)

In the first trial, Professor Brown testified he did not consider the zakat committees to be

part of Hamas, controlled by Hamas, or operating for the benefit of Hamas.  (First Trial Tr. Vol.

27 at 45-46.)  He also criticized the government's experts.  He stated Avi failed to study the

historical data in reaching his conclusions.  (*Id.* at 49.)  He claimed Dr. Levitt did not include

evidence that would undermine his opinions, and that Levitt relied too much on western and

Israeli sources.  (*Id.* at 66-69.)

On cross-examination, however, the government argued Brown did not know who the

Hamas leaders were or who controlled the zakat committees.   Brown admitted he was unfamiliar

with the names of many of the Hamas leaders, he did not know the names of the zakat committee

board members, and did not know the names of any of the Hamas founders in the West Bank.

(*Id.* at 113, 150-77.)

Further, although Petitioners state that "[u]nlike the government expert, [Brown] had

actually visited some Zakat Committees," (Pet'rs' Joint Mem. at 10), the record shows Brown

made only one visit to one of the indictment committees.  (First Trial Tr. Vol 27 at 66-69, 144.)

He made an appointment to speak to someone at this committee, but did not remember the name

of the person.  (*Id.* at 147.)  He stated that while at this appointment, he did not see anything that

would lead him to believe it was controlled by Hamas.  (*Id.*)  This visit does not establish that

Brown was a crucial witness for the defense.

Moreover, defense counsel called former State Department employee Edward Abington as an expert to argue that Hamas did not control the zakat committees. Abington testified that while employed with the State Department, he interacted with many of the zakat committees. He stated he did not believe Hamas controlled these committees and he was never informed by anyone that the committees were controlled by Hamas. (Trial Tr. Vol. 33 at 32, 145.) Defense counsel relied on Abington's prior State Department employment to argue in closing that:

> Mr. Abington was as credible a witness as you will ever see – a career State Department employee. He is from the government, just like these Prosecutors, and he has no ax to grind. He can't stand Hamas.

(Trial Tr. Vol. 35 at 174.) Petitioners have failed to show defense counsel was constitutionally ineffective for failing to call Professor Brown as a witness.

### D.    Motion to Suppress

Petitioners argue they received ineffective assistance of counsel when counsel failed to pursue a motion to suppress the evidence obtained from HLF's offices by challenging the blocking order.

On December 3, 2001, the Treasury Department's Office of Foreign Assets Control ("OFAC"), under the authority granted in the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* ("IEEPA"), designated Hamas as a terrorist organization and issued a blocking order that prohibited any transaction involving the blocked property without a license from OFAC. *El-Mezain*, 664 F.3d at 541. The day after the blocking order was issued, the Treasury Department seized HLF's property and moved it into storage. *Id.* at 542. There is no indication that the government searched or otherwise examined the property at that time. *Id.*

Page 13

Later, the FBI obtained a warrant to search the property. At trial, Petitioners moved to suppress the evidence found during the FBI search because OFAC lacked a warrant at the time the government seized the evidence and moved it into storage. Petitioners did not challenge OFAC's blocking order. The Court denied the motion to suppress.

While this case was pending before the Fifth Circuit on direct appeal, the Ninth Circuit held in *Al-Haramain Islamic Foundation v. United States Department of the Treasury*, 660 F.3d 1019 (9th Cir. 2011), *opinion amended and superseded on denial of rehearing en banc by Al-Haramain Islamic Found. v. United States Department of the Treasury*, 686 F.3d 965 (2012), that OFAC was required to obtain a warrant before it could issue a blocking order under IEEPA. *Id.* at 1043-48. Petitioners now argue counsel was ineffective for failing to challenge the warrant-less blocking order in their motion to suppress.

The Fifth Circuit affirmed the district court's order denying the motion to suppress, although the Fifth Circuit affirmed on grounds other than those stated by the district court. Petitioners contend that the Fifth Circuit's decision "implied that a challenge to the blocking order in this case would have been well founded." (Pet'rs' Joint Mem. at 15.)

The Fifth Circuit, however, expressly stated that its opinion did not resolve whether a warrant was necessary for a blocking order under IEEPA. *El Mezain*, 664 F.3d at 542. Instead, the Court noted there was no challenge to the blocking order, so its analysis presumed the blocking order was valid. *Id.*

Further, Petitioners have cited no authority showing that at the time of trial, any court had held that a warrant was required for a blocking order under IEEPA. *See United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009) (stating counsel is not required to anticipate changes in the

Page 14

law).  In fact, in 2002 when HLF filed a civil action challenging the blocking order and its

designation as a terrorist organization, the district court for the District of Columbia determined

the blocking order was not a seizure and that HLF was therefore not entitled to Fourth

Amendment protections regarding the blocking order.  *Holy Land Foundation for Relief &*

*Development v. Ashcroft*, 219 F. Supp. 2d 57, 78-79 (D.D.C. 2002); *see also, Islamic American*

*Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 38 (D.D.C. 2005) (stating IEEPA

blocking order "does not create a cognizable claim under the Fourth Amendment").  Defense

counsel therefore reasonably chose to argue that the government violated Petitioners' Fourth

Amendment rights by entering HLF offices, seizing property, and moving this property to a

government storage location without a warrant.  Petitioners have failed to establish ineffective

assistance of counsel.

> E.    **Selective Prosecution**

Petitioners claim counsel were ineffective for failing to raise a selective prosecution

argument.  Petitioners state,"[t]he government selectively prosecutes Muslims and Muslim

groups under the statutes used in this case and under similar statutes.  Non-Muslims are rarely, if

ever, prosecuted for this alleged conduct."  (Pet'rs' Joint Mem. at 16.)

To show the government has engaged in selective prosecution, a petitioner must show

that the prosecution "'had a discriminatory effect and that it was motivated by a discriminatory

purpose.'"  *United States v. Armstrong*, 517 U.S. 456, 466 (1996) (quoting *Wayte v. United*

*States*, 470 U.S. 598, 608 (1985)).  This requires a petitioner to show both (1) that "similarly

situated individuals" outside the protected group were not prosecuted, and (2) that the decision to

prosecute was "invidious or in bad faith, in that it rests on such impermissible considerations as

race, religion, or the desire to prevent his exercise of his constitutional rights." *United States v. Webster*, 162 F.3d 308, 333-34 (1998) (citing *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993)). Further, in making this showing, "the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner." *Id.* at 334.

In support of their claim, Petitioners submit an article by Law Professor Sahar Aziz, a copy of the Westlaw case notes for 18 U.S.C. § 2339B, and news articles that Petitioners claim show non-Muslims were not prosecuted for committing similar acts. In Professor Aziz's article, she criticizes the Petitioners' convictions in this case. Professor Aziz states the Court's jury instructions "erroneously instructed the jury as to the law" and she argues the government selectively prosecutes Muslims. (Pet'rs' Joint Mem. Ex. 6.) Professor Aziz's opinion article does not establish that Petitioners were selectively prosecuted in this case.

Petitioners also allege the Westlaw case notes for 18 U.S.C. § 2339B show that "virtually all of the prosecutions under this statute are against Muslims." (*Id.*; Pet'rs' Joint Mem. at 56.) Petitioners, however, provide no analysis of any of these cases. They have failed to show that any of these cases involved invidious or bad faith prosecutions, and have failed to show that these prosecutions establish any evidence that the government prosecuted Petitioners in this case because they are Muslim. Further, the government in its briefing cited numerous prosecutions under 18 U.S.C. § 2339B involving individuals who are not Muslims. (*See* United States' Opp'n at 31.)

Petitioners also claim similarly situated Non-Muslims were not prosecuted. They cite news articles showing that certain politicians and former government officials were paid

Page 16

speaking fees by designated terrorist organization Mojahedin-e Khalq ("MEK"), and that these politicians and former government officials advocated that MEK be removed from the list of designated terrorist organizations.[5] (Pet'rs' Joint Mem. Ex. 6.) Petitioners have wholly failed to show that accepting speaking fees and advocating for the delisting of MEK is substantially similar to the "plethora of evidence" that Petitioners financed Hamas through HLF and the zakat committees. *El Mezain*, 664 F.3d at 527.

Petitioners also submit a New York Times article discussing criminal charges against France's largest bank, BNP, Paribus. (Pet'rs' Supp. Information) (ECF No. 41). Petitioners claim, "[t]he article is yet another example of the justice department not pursuing criminal charges against non-Muslim defendants for charges similar to those brought against these Movants." (*Id*. at 2.) The article states that an Iranian charity in New York acted on behalf of Iran to support terrorism in Gaza. Although the United States prohibits banks from conducting financial transactions with Iran, an investigation determined that BNP, Paribus and certain other banks concealed Iran's financial connections with the charity, presumably so that the banks could profit from handling these transactions. The Justice Department filed criminal charges against BNP, Paribus, which was assessed a record fine of $8.9 billion. The other banks and the Iranian charity agreed to pay settlements. Petitioners do not explain how this article supports their selective prosecution claim. To the extent Petitioners may be claiming that only companies were charged, rather than individuals, the article does not address this issue. The article provides insufficient evidence and/or detail to support Petitioners' selective prosecution claim.

---

[5]The government delisted MEK on September 28, 2012. *See* September 28, 2012 State Department press release, http://www.state.gov/r/pa/prs/ps/2012/09/198443.htm.

Page 17

Additionally, defense counsel's decision not to make a selective prosecution argument

was reasonable. Counsel chose instead to file a motion in limine arguing that the government

had criminalized religiously motivated conduct under the Religious Freedom Restoration Act

("RFRA"). The motion in limine stated:

> This is not a selective prosecution motion based on the prosecutor's motive, under which
> an entirely different, and more restrictive standard would apply. *See United States v.
> Armstrong*, 517 U.S. 456 (1996). Rather, it is an assertion of a defense specifically
> provided for by Congress, arising from these defendants' right to the free exercise of their
> religion under RFRA and the First Amendment.

(Motion in Limine (ECF No. 584), renewed May 30, 2008 (ECF No. 1036 at 3).) Although

defense counsel Nancy Hollander, Theresa Duncan and Marlo Cadeddu filed affidavits and/or

declarations stating the failure to include a selective prosecution argument was not the result of

trial strategy, (ECF Nos. 17, 20, 26 in Cause No. 3:13-CV-4299-P),[6] the motion in limine

contradicts this claim. Moreover, Petitioners have failed to show they were prejudiced by

counsel's failure to raise a selective prosecution claim because they have wholly failed to

establish any colorable claim of selective prosecution.

Finally, Petitioners argue they should be granted discovery and a hearing on their

selective prosecution claim. "A defendant is not automatically entitled to an evidentiary hearing

to make the required showing [of selective prosecution]. He must first present facts 'sufficient to

create a reasonable doubt about the constitutionality of [his] prosecution' resulting from selective

prosecution." *Webster*, 162 F.3d at 334 (quoting *United States v. Jennings*, 724 F.2d 436, 445-46

(5th Cir. 1984)); *see also, Armstrong*, 517 U.S. at 468 ("The justifications for a rigorous standard

---

[6]The affidavits/declarations were filed in each case. The Court cites only the ECF
number for the lead case, Cause No. 3:13-CV-4299-P.

for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."). To be entitled to discovery on their selective prosecution claim, Petitioners are required to submit "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)). Petitioners have failed to make this showing. Their motion for discovery and/or a hearing is denied.

### F.    Exculpatory Evidence

Petitioners argue defense counsel was ineffective for failing to argue that *Brady*[7] required the government to review the intercepted phone calls of various defendants, and the material seized by Israel from the zakat committees, to determine if any of this evidence was exculpatory. Petitioners allege that had the government reviewed this material, "evidence would have been discovered that showed the defendants were attempting to comply with the law and that Hamas did not control the Zakat Committees." (Pet'rs' Joint Mem. at 17, 52.)

To establish a *Brady* claim, Petitioners must show the prosecution suppressed favorable, material evidence that was not discoverable through due diligence. *Brady*, 373 U.S. at 87 (1963). Evidence is "material" if there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed to the defendant. *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999). *Brady*, however, "does not obligate the [government] to furnish a defendant with evidence that is fully available to the defendant through the exercise of reasonable diligence." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (citing *Rector v.*

---

[7]*Brady v. Maryland*, 373 U.S. 83 (1963).

Page 19

*Johnson*, 120 F.3d 551, 558 (5ᵗʰ Cir. 1997)).

### (i)   Intercepted Telephone Calls

Petitioners argue the government was required to review all of Petitioners' intercepted

calls and provide them with any exculpatory statements.  The government "intercepted tens of

thousands of telephone calls and facsimile transmissions through 24-hour surveillance of the

defendants . . . ."  *El-Mezain*, 664 F.3d at 518.  The government declassified English summaries

of the entire intercepts for four of the eight FISA subjects and provided this material to the

defense.  *Id*. The government also provided defense counsel with the remaining classified

intercepts, although these intercepts were in Arabic.  Defense counsel were able to review these

intercepts because they had the proper security clearances, but they could not share these

intercepts with Petitioners because Petitioners did not have the security clearances.  *Id*. at 519.

The government also offered to seek declassification of any specific intercepts identified by

defense counsel.  *Id*.

Petitioners claim that because the classified intercepts were in Arabic, they did not have

access to this evidence.  In response to this argument, the Fifth Circuit stated:

> Despite arguing that they could not understand the Arabic calls, counsel concede in their
> brief that they began the process of having the calls translated by cleared translators, first
> in Texas and later in Washington, D.C. [FN17]
>
> [FN 17]  According to the defendants, their Texas translator lost his clearance and was
> unable to continue, and the defense abandoned use of the Washington translators because
> "the process was unwieldly and produced little useful information."  These circumstances
> were unfortunate, but they were not the fault of the Government.

*Id*. at 523 & n.17.

The record shows the government did not suppress the intercepted calls.  *Brady* does not

require that the government sift through the evidence it provided to Petitioners in an effort to locate exculpatory material. *See United States v Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997) ("[T]here is no authority for the proposition that the Government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over.") *overruled in part on other grounds by United States v. Parsons*, 367 F.3d 409 (5th Cir. 2004) (en banc); *United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) (finding government was not required to point the defense to possibly exculpatory evidence contained in the over 500,000 documents it produced to the defense); *United States v. Runyan*, 290 F.3d 223, 245-46 (5th Cir. 2002) (finding that where defendant had access to images contained on a particular computer, *Brady* did not require the government to search the images for possible exculpatory evidence). Further, Petitioners have failed to show these intercepted calls contained exculpatory evidence. Petitioners' claim is without merit.

### (ii)   Documents in Israel

Petitioners claim the government was required to review all the documents seized by the Israeli Defense Forces for exculpatory evidence. These documents were maintained by the Israeli government in a warehouse in Israel.

Petitioners claim the "Israeli Defense Forces are aligned with the government and are agents of the government for purposes of this *Brady* analysis." (Pet'rs' Joint Mem. at 53.) Petitioners cite no authority or factual basis for this claim. Petitioners have failed to show an agency relationship between the prosecution and the Israeli Defense Forces. *See Avila v. Quarterman*, 560 F.3d 299, 309 (5th Cir. 2009) (stating defendant must show the purported agent was part of the "prosecution team"); *United States v. Reyeros*, 537 F.3d 270, 283 (3d Cir. 2008)

(finding no agency relationship where government of Columbia responded to a United States request for investigative or judicial assistance).

Further, Petitioners have failed to show these documents contained exculpatory evidence. The government's expert, Avi, testified that he provided all of the seized material that was relevant to the zakat committees, and that he did not cherry-pick documents that were favorable to the government. (Trial Tr. Vol. 29 at 104-106.) The seized documents that were not relevant to the zakat committees remained in Israel and were not produced to the government or the defense. (*Id.*)

To support their claim that the documents in Israel contained exculpatory evidence, Petitioners cite testimony from their expert, Ed Abington, who testified that he had visited zakat committees in the West Bank and had seen Fatah posters. Petitioners claim this evidence was exculpatory because it undermined Avi's opinion that the zakat committees were controlled by Hamas. Abington's testimony, however, was insufficient to show that the government suppressed exculpatory evidence. In denying Petitioners' appeal of the district court's decision to deny their request for a letter rogatory to review these documents in Israel, the Fifth Circuit stated:

> The defendant's hope that combing through all 2000 boxes of the seized material might have produced exculpatory evidence is purely speculative. [citations omitted.]
>
> The defendants' reliance on Abington's testimony does not alter the result. Abington provided no details about the Fatah and Arafat pictures he had purportedly seen. . . . He testified that he visited various zakat committees, but he was not asked which zakat committees he was visiting when he allegedly saw this material. Because there is also no indication in the record that the Israeli military had actually seized such materials, it also not clear that the letter rogatory would have led to evidence favorable to the defense.

*El-Mezain*, 664 F.3d at 517-18.

Petitioners have failed to establish that the government suppressed exculpatory evidence or that defense counsel was ineffective for failing to raise this claim.

## G.    Entrapment

Petitioners claim defense counsel were ineffective for failing to pursue an entrapment defense. To establish the affirmative defense of entrapment, a defendant must first make a prima facie showing of (1) his lack of predisposition to commit the offense, and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense. *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir. 2009) (citing *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997)). For the evidence to be sufficient, a defendant must show the evidence "provides, at least, a basis for a reasonable doubt on the ultimate issue of whether the criminal intent originated with the government." *Bradfield*, 113 F.3d at 522. A defendant must show both the lack of predisposition and government inducement. *Theagene*, 565 F.3d at 919.

### (i)    Predisposition

To determine whether a defendant lacked the predisposition to commit the crime, the court considers whether the defendant "'intended, was predisposed, or was willing to commit the offense *before first being approached by government agents*.'" *Id.* (quoting *Bradfield*, 113 F.3d at 522). "A defendant lacks predisposition where he had no prior interest or experience related to the crime, displayed 'significant hesitation or unwillingness, or attempt[ed] to return discussions to lawful conduct.'" *United States v. Nelson*, 732 F.3d 504, 514 (5th Cir. 2013) (quoting *Theagene*, 565 F.3d at 920). In contrast, evidence of predisposition can be shown by "active, enthusiastic participation or demonstrated expertise in the criminal endeavor." *Theagene*, 565

F.3d at 919.

To support their claim of lack of predisposition, Petitioners cite an April 23, 1996 government recorded phone call in which Petitioners Baker and Elashi discussed the possibility that the Treasury Department might designate the zakat committees as terrorist organizations. In that call, Elashi stated that if the zakat committees were designated, he would "abide by the law." (Pet'rs' Joint Mem. at 19.)

This phone call between Baker and Elashi, however, fails to establish a lack of predisposition to commit the crimes. Petitioners' support for Hamas began prior to the designation of Hamas as a terrorist organization in 1995 and continued until HLF was shut down as a result of the blocking order. *El-Mezain*, 664 F.3d at 527- 31. As the Fifth Circuit stated: "We believe the jury could not help but infer from the above evidence that the defendants had a close association with Hamas and that HLF acted to fund Hamas both before and after Hamas's designation as a terrorist organization." *Id.* at 531.

Additionally, the evidence shows Petitioners attempted to conceal their connection to Hamas.

> For example, at the Philadelphia meeting Baker made statements suggesting that participants should refer to Hamas only in code, and he instructed the participants how to respond if anyone asked about the purpose of the meeting. His statements suggested that deceptive practices were necessary to conceal the intent of the Palestine Committee. They were also consistent with security "guidelines" found among HLF's materials stored at Infocom, which directed that there should be cover stories agreed upon to explain things like meetings and travel. [FN20]
>
> [FN 20] The document, which was labeled "The Foundation's Policies & Guidelines," included comprehensive policies for ensuring the secrecy of the organization's activity. For example, the policies directed that documents should be arranged at meetings so that they could be easily gotten rid of in an emergency; that measures should be taken before a meeting to be sure there is no hidden surveillance equipment; that an alert signal should

> be given if the location is monitored or if a member of the committee is followed; and that documents should be hidden when traveling and a pretext should be devised in case they are discovered in a search.

*El-Mezain*, 664 F.3d at 529 & n.20. The evidence shows Petitioners were active and willing participants in the offenses.

### (ii)  Inducement

Government inducement consists of "the creative activity of law enforcement officials in spurring an individual to crime." *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003). Courts have found inducement where "government agents harass or threaten a defendant, or take actions 'designed specifically to take advantage of the defendant's weaknesses.'" *Theagene*, 565 F.3d at 922 (citing *Guiterrez*, 343 F.3d at 420).

Petitioners claim the government induced the offenses by failing to designate any of the zakat committees as a terrorist or terrorist group. Petitioners state that in 1995, Defendant Elashi, on behalf of HLF, met with the head of OFAC and other Treasury officials and sought guidance regarding Hamas's designation as a terrorist group. Petitioners claim the government declined to provide them with a list of approved entities they could support. Petitioners state they also retained counsel in 1997 who met with government officials to determine if they were in compliance with the law, and that "no one cautioned him" that Petitioners should not deal with the zakat committees. (Pet'rs' Joint Mem. at 20.)

Such alleged failure to provide guidance does not rise to the level of governmental inducement. The government did not solicit, harass or encourage Petitioners into committing the offenses. Petitioners have submitted no authority that the alleged failure of the government to provide clearer guidance constitutes entrapment.

## H.    Mistake of Law

Petitioners claim counsel were ineffective for failing to pursue a mistake of law defense.

Petitioners allege that based on their meetings with government officials, "defendants were led to

believe that contributions to the Zakat Committees were not prohibited." (Pet'rs' Joint Mem. at

20.)

Mistake of law is generally not a defense to a criminal charge. *See United States v.*

*Rodrigo*, 934 F.2d 595, 597 n.3 (5th Cir. 1991) (citing *United States v. Jones*, 642 F.2d 909, 914

(5th Cir. 1981)).  Where a crime requires a specific intent, the question of knowledge and intent

are questions for the factfinder.  *Id.* (citing *Cheek v. United States*, 498 U.S. 192 (1991)).

In this case, the jury charge instructed the jury that to find defendants guilty, they must

find beyond a reasonable doubt that defendants' conduct was "willful."  The charge instructed

that "willful" conduct is something done "purposely, with the specific intent to do something the

law forbids; that is to say, with bad purpose either to disobey or disregard the law.  (Jury Charge

at 12) (ECF No. 1246).  Defense counsel argued that Petitioners lacked the willful intent to

violate the law because they "clearly intended to obey" the law.  (Trial Tr. Vol. 35 at 138) (ECF

No. 1345); (Trial Tr. Vol. 36 at 41-42, 77) (ECF No. 1346.)  The jury rejected Petitioners'

argument by finding them guilty.  Petitioners' ineffective assistance of counsel claim is without

merit.

## I.    Insufficiency of the Evidence

 Petitioners claim appellate counsel were ineffective for failing to argue the evidence was

insufficient to show that Hamas controlled the zakat committees listed in the indictment.

In reviewing a sufficiency of the evidence claim, the court determines "whether, after

Page 26

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *United States*

*v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

(1979)).

     The record shows the government submitted extensive evidence that the zakat

committees in the indictment were controlled by Hamas.  The Fifth Circuit reviewed this

evidence in determining that the admission of certain hearsay evidence was harmless error.  The

Court stated:

> Levitt and Avi both testified about Hamas's control of the zakat committees.  Levitt
> based his opinion on interviews with Palestinian, Israeli, and American authorities, on the
> Hamas leadership of the zakat committees, and on the Hamas-related materials found in
> the committees.  He specifically identified individuals associated with the Ramallah and
> Jenin committees as being Hamas members . . . .  Levitt and Avi both identified Hamed
> Bitawi, from the Nablus Zakat Committee, as a Hamas member.
>
> There was also other evidence connecting the Nablus Zakat Committee and Bitawi to
> Hamas.  For instance, Bitawi's name was listed on the Nablus committee's bank records
> obtained by the FBI.  His picture was found on HLF computers wherein he was seen
> holding a gun and a Quran, with the word "Hamas" in the background.  Hamas leader
> Mishal specifically praised Bitawi in a 1992 video recording.  Another video . . . showed
> Bitawi participating in a meeting along with approximately a dozen other individuals who
> had been deported from Israel.  Bitawi introduced himself in the video as being from the
> Nablus Zakat Committee.  Other participants . . . actually introduced themselves as
> founders of Hamas, while Avi identified still others in the video as Hamas members.  The
> Hamas logo flashed on the screen several times.  One of the participants at the meeting
> specifically mentioned Baker and El-Mezain, as well as HLF, which was providing
> support for the deportees.
>
> . . . .
>
>     Further evidence related to Hamas that was seized from the Nablus committee
> included a postcard depicting two Hamas suicide bombers that praised a suicide attack
> by one of them in 2001, as well as a key chain with pictures of Hamas founder Sheikh
> Yassin.  Numerous Hamas posters and postcards with pictures of suicide bombers and
> Hamas leaders and symbols were seized from the Nablus, Tulkarem, Hebron and Jenin

committees.

Other documents seized from the zakat committees by the Israelis also showed Hamas's influence on the committees. A few examples demonstrate this point. An April 2001 "political statement" was seized from ICS Hebron. The statement supported Hamas and jihad and advocated "infliction upon the enemy [of] heavy casualties." A 1999 letter from a group of prisoners was also found in ICS Hebron. In the letter, the prisoners asked that the Young Muslim Society, a sub-group of ICS Hebron, continue to support them. Avi testified that the letter was consistent with Hamas's support for prisoners.

Avi also testified that the head of ICS Hebron, Abdel Khaleq al-Natsheh, was a Hamas leader. His testimony was corroborated by a 2001 video seized from the zakat committee wherein al-Natsheh was described as the head of Hamas in Hebron. Furthermore, Natsheh was also listed in Marzook's personal phone book. [Marzook was an unindicted co-conspirator and leader of Hamas's political wing during the 1990's].

Israeli authorities also seized internal Hamas communications from the zakat committees. For example, a document from January 2001 was found folded very small and concealed in al-Natsheh's offices at ICS Hebron. The document reported the results of Hamas's internal election and discussed the significance of providing support for martyrs and prisoners. The secretive nature of the document was evident from instructions directing readers to call a telephone number in Switzerland for "emergency matters" and to give a code phrase. Avi testified that these instructions were a common security precaution for Hamas. He also opined that the presence of the document at the zakat committee was significant because it showed that the committee's focus included Hamas's internal affairs.

Other evidence also showed connections between Hamas and the zakat committees that was cumulative of the Shorbagi testimony and the PA documents. Abu Zeid identified himself as being from the Jenin committee in the tent video. Avi also identified Abu Zeid as a Hamas figure. His testimony was further supported by a video of a conference sponsored by the Muslim Arab Youth Association ("MAYA") in 1992. Baker was a MAYA board member, and Hamas leader Mishal referred to Abu Zeid at the conference as an important person in the Palestinian struggle. Abu Zeid was further listed as a ranking Hamas figure in a book about Hamas published by the UASR [United Association for Studies and Research]. The book, entitled *The Palestinian Intifada in the Hebrew Press: A study about the Islamic Resistance Movement "Hamas,"* was found among HLF's records in the office of Defendant Odeh in 2001. Abu Zeid's name also appeared in Marzook's personal phone book, as well as on HLF's speakers list. Moreover, in Elbarasse No. 22, the letter addressed to Baker, the declarant asserted that the Jenin Zakat Committee was "Guaranteed . . . [b]y virtue of Mr. Mohamed Fouad Abu Zeid's position."

Levitt further identified still another member of the Jenin Zakat Committee, Fawaz Hamad, as a Hamas member. According to testimony from Levitt and Agent Burns, Hamad not only worked for the Jenin Zakat Committee but also became an HLF representative in Jenin after serving time in an Israeli prison for aiding Hamas. Hamad operated a hospital that was controlled by the Jenin committee, and he wrote a letter to defendant El-Mezain, Infocom Search No. 30, that discussed the hospital operation. The letter identified various hospital board members and others as "Islamist," "deportee," "brother," "semi-brother," or "Fatah." This letter was among the HLF documents found at Infocom and was consistent with other evidence associating the term "Islamists" with Hamas. Notably, at the Philadelphia meeting in 1993, Muin Shabib referred to the Jenin committee's building of the hospital, stating that it "is really ours, for the Islamists either in management or the teams working in it." A document found in Ashquar's home, Ashquar Search 5, also referred to the "Islamist" presence in various charitable organizations, including ICS Hebron, Nablus, Tulkarem, and Jenin.

Shorbagi also identified Jamil Hamami as a Hamas member, but there was ample evidence of this fact. Hamami was associated with the Islamic Science and Culture Center in the West Bank, to which HLF donated almost half a million dollars before the center was closed in 1996. Levitt and Avi both identified Hamami as a Hamas leader . . . . He was further identified as a ranking Hamas leader in the UASR book about Hamas found in Odeh's office. Furthermore, the search of HLF offices uncovered a UASR publication that referred to Hamami as a Hamas leader. The publication, *The Middle East Affairs Journal*, HLF Search No. 108, was published in 1998 and stated that Sheikh Yassin assigned Hamami to establish a Hamas branch in the West Bank. It is also reported that Hamami became the liaison between the Hamas command in the West Bank and the leadership in Gaza. Hamami was also videotaped with Baker and El-Mezain at a 1990 fundraising event. On the video, Mushtaha exhibit 1, Baker specifically thanked Hamami for his presence. On another video, Infocom No. 67, Hamami was seen at a school construction site thanking Baker, El-Mezain, and HLF for their support. This evidence contradicted a sworn declaration from Baker wherein he denied that he and other HLF board members had any connection to Hamas.

With regard to the Ramallah Zakat Committee, which the PA documents linked to Hamas, both Levit and Avi also testified that Hamas controlled it. Furthermore, the 1991 Elbarasse No. 22 letter to Baker, and statements at the Philadelphia meeting in 1993, also indicated that Hamas controlled the zakat committee. The letter stated that "all of [Ramallah] is ours," while Shabib stated at the Philadelphia meeting, "We could say that the zakat committee is ours, including its management and officers." Evidence seized from HLF included a letter from Baker addressed to the Ramallah Zakat Committee's director, Dr. Mahmoud Al-Rumhi, whose name and telephone number also appeared along with several other people identified as Hamas members on a list seized from Elbarasse's home. Elbarasse Search 24. The UASR journal found in HLF's records identified still another member of the Ramallah Zakat Committee, Mahmoud Mosleh, as

Page 29

having been arrested by the PA along with several leaders of Hamas. Similarly, the book about Hamas found in Odeh's office also identified Ramallah Zakat Committee member Fadel Saleh Hamdan as one of the ranking Hamas members who had previously been arrested.

*El-Mezain*, 664 F.3d at 531- 34.

Viewing this evidence in the light most favorable to the prosecution, Petitioners have failed to show that no rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. Petitioners' claim that counsel was ineffective for failing to raise this claim is therefore without merit.

### J.   Vagueness

Petitioners claim appellate counsel was ineffective for failing to argue that 18 U.S.C. § 2339B and 50 U.S.C. §§ 1701 - 1706 ("IEEPA") are constitutionally vague as applied to them.

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

Petitioners raised these claims before the district court in a motion to dismiss the superceding indictment. (*See* Pet'rs' Joint Mot. and Mem. to Dismiss (ECF No. 392); Pet'rs' Joint Reply (ECF No. 451); and Pet'rs' Joint Supp. Mot. (ECF No. 488).) Judge Fish denied the motion to dismiss, finding that neither statute was unconstitutionally vague as applied. In rejecting Petitioners' claims regarding § 2339B, Judge Fish stated:

> It requires no extraordinary acumen to realize that funneling money to an organization operated on behalf of a specially designated terrorist organization with the intent that the

money be passed to the designated terrorist group would, at the very least, constitute an attempt to provide support or resources to the terrorist organization in contravention of § 2339B.

(Mem. Order at 5) (ECF No. 650). Further, the Supreme Court has determined that the statute's specific intent requirement reduces the potential for any vagueness. *See Humanitarian Law Project*, 561 U.S. at 21 (rejecting claims that § 2339B was unconstitutionally vague as applied).

Likewise, Petitioners' claim that 50 U.S.C. §§ 1701-1706 is unconstitutionally vague is without merit. Under this statute, Petitioners were convicted of providing funds, goods, and services to Hamas and also conspiracy to provide funds, goods, and services to Hamas. The statute required that the government prove Petitioners acted willfully. "[A] requirement of willfulness makes a vagueness challenge especially difficult to sustain." *United States v. Hescorp*, 801 F.2d 70, 77 (2d Cir. 1986) (upholding IEEPA regulations); *see also United States v. Zhi Young Guo*, 634 F.3d 1119, 1121 (9th Cir. 2011) (stating § 1705(c) requires the government to prove defendant's knowledge of the law which "mitigates a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed") (quoting *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006)); *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821 (N.D. Ohio 2005) (citing "willfulness" requirement of § 1705(b) in rejecting vagueness claim); *United States v. Mizra*, Cr. No. H-06-421, 2010 WL 1427220 (S.D. Tex. Apr. 7, 2010) (denying IEEPA vagueness claim). In convicting Petitioners, the jury found Petitioners knew their conduct was wrong. Petitioners' vagueness argument is without merit.

## K.    Writ of Certiorari

Petitioners claim appellate counsel was ineffective for failing to argue in their petition for

writ of certiorari to the Supreme Court that the Fifth Circuit conducted an erroneous harm analysis on four evidentiary issues.

Petitioners' claim is without merit. A petitioner is not entitled to counsel on collateral review. A claim of ineffective assistance of counsel in filing a petition for writ of certiorari therefore fails to raise a constitutional claim. *See Ross v. Moffit*, 417 U.S. 600, 619 (1974); *Wainwright v. Toma*, 455 U.S. 586 (1982) (per curiam) ("Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application [for certiorari] timely."); *Clark v. Johnson*, 227 F.3d 273, 283 n.5 (5th Cir. 2000) ("Because there is no right to counsel for discretionary appeals, we need not analyze this claim under *Strickland*.").

## 2. Actual Innocence

Petitioners claim they are actually innocent of the charges. Petitioners base their actual innocence claim on the assertion that "the government presented no evidence proving that Hamas controlled the Zakat Committees." (Pet'rs' Joint Mem. at 49.) They also claim that the affidavits submitted by the zakat committee members constitutes new evidence that further establishes their actual innocence.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also United States v. Fields*, 761 F.3d 443, 479 (5th Cir. 2014) ("[W]e note that our caselaw does not recognize freestanding actual innocence claims."); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) ("[A]ctual innocence is not an independently cognizable federal-habeas claim.").

Petitioners' freestanding claim of actual innocence is therefore not cognizable in this case.

Petitioners have also failed to establish that they are actually innocent. To establish actual innocence, a petitioner must show, as a factual matter, that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition. *Schlup v. Delo*, 513 U.S. 298, 327 (2006). In an attempt to make this showing, Petitioners rely on the affidavits from the zakat committee members stating that the committees were not controlled by Hamas and were not a part of Hamas.

As discussed above, Petitioners have submitted no evidence that any of the affiants were willing and able to provide their testimony in Dallas at the trial. Additionally, Petitioners fail to show it is more likely than not that no reasonable juror would have convicted them in light of the affidavits. As discussed throughout this opinion, there was a "large amount of evidence connecting Hamas to both HLF and the zakat committees." *El Mezain*, 664 F.3d at 535. The evidence of Hamas's ties to the zakat committees "was also strong evidence that the defendants provided material support to Hamas as charged in the indictment." *Id.* at 531- 35. Petitioners have failed to show they are actually innocent.

## 3. Procedural Bar

Petitioners claim the government violated *Brady* by suppressing exculpatory evidence and that prosecutors selectively prosecuted Petitioners for improper purposes. Respondent argues these claims are procedurally barred because Petitioners failed to raise the claims on direct appeal.

When a defendant fails to raise a claim on direct appeal, the claim is procedurally defaulted and can only be considered under § 2255 if the petitioner can show cause for his failure

Page 33

to raise the claim on direct appeal, and actual prejudice, or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996). As discussed above, Petitioners have failed to show they are actually innocent. To the extent Petitioners allege the failure to raise these claims on direct appeal was caused by ineffective assistance of counsel, the Court has addressed these claims above and has determined the claims are without merit. Petitioners have failed to allege any other cause for not raising these claims on direct appeal. The claims are therefore procedurally barred.

**4.    Harmless Error Standard**

Petitioners claim the Fifth Circuit violated their due process rights by improperly applying a harmless error standard to the admission of certain trial evidence. Petitioners, however, raised this claim before the Fifth Circuit by arguing that the admission of this evidence was reversible error. After denial of their claims, Petitioners further raised the claim on direct appeal by arguing in their Joint Petition for Rehearing En Banc that the Fifth Circuit improperly applied a harmless error analysis. (*See* Pet'rs' Joint Mem. Appendix 3.) Petitioners cannot relitigate this claim in this § 2255 petition. *See United States v. Rocha*, 109 F.3d 225, 230 (5th Cir. 1997) (finding petitioner cannot raise claims in his § 2255 petition that were decided on direct appeal); *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) (same). These claims are denied.

**5.    Evidentiary Hearing**

Petitioners claim they are entitled to an evidentiary hearing on the above claims. "'A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files and records of the case conclusively show that the prisoner is entitled to no relief.'" *United*

*States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992); *United States v. Bernard*, 762 F.3d 467, 483 (5th Cir. 2014) (same). In this case, Petitioners have not established any basis for granting an evidentiary hearing. There are no unresolved issues of fact requiring such a hearing, and the motion, files and records of the case conclusively establish that Petitioners are entitled to no relief.

## 6.     **Abdulrahman Odeh**

In addition to the joint claims above, Petitioner Odeh raises the three following ineffective assistance of counsel claims.

### A.     **Cross-Examination of Witnesses**

Odeh claims his counsel was ineffective when counsel cross-examined government witnesses who did not testify specifically about him. Odeh claims "[t]his caused the jury to believe that Mr. Odeh played a greater role in the administration and decision-making process with the Holy Land Foundation than he actually did." (Odeh Mem. at 5) (ECF No. 4, Cause No. 3:13-CV-4299-P).

Odeh was charged with three counts of conspiracy, including conspiracy to provide material support to a Foreign Terrorist Organization (Count 1), conspiracy to provide funds, goods, and services to a Specially Designated Terrorist (Count 11), and conspiracy to commit money laundering (Count 22). It was therefore reasonable trial strategy for defense counsel to challenge the government's witnesses in an attempt to show that no conspiracy existed.

Additionally, Odeh's counsel argued extensively in closing that Odeh's role was minor. Counsel argued Odeh did not join HLF until 1994, he was not on the Board of HLF, he was a mere employee who performed his job as he was instructed, there was minimal evidence

pertaining to Odeh, and no evidence showed Odeh knew HLF was raising money to support

Hamas. (Trial Tr. Vol. 36 at 6-20.)  Odeh has not shown that his counsel's conduct fell outside

of reasonable trial strategy.  *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).

### B.    Failure to Challenge Sentence

Odeh claims appellate counsel was ineffective for failing to challenge the reasonableness

of his fifteen year sentence under *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. §

3553.  Odeh alleges that although the government stated Odeh was the least culpable defendant,

"the Court did not sentence Odeh to a less (sic) sentence than all of the other defendants." (Odeh

Mem. at 7.)

Odeh was convicted of three counts of conspiracy.  The maximum sentence for Count 1

was 15 years, the maximum sentence for Count 11 was 10 years, and the maximum sentence for

Count 22 was twenty years.  Therefore, Odeh's statutory sentence exposure was 45 years in

prison.  The Court sentenced him to 15 years in prison.  Petitioner El-Mezain was the only other

Petitioner to also receive 15 years, which was his maximum sentence exposure since he was

convicted only on Count 1.  All of the other Petitioners were sentenced to more than 15 years in

prison.

Additionally, the Court specifically considered the factors in 18 U.S.C. § 3553 in

determining Odeh's sentence.  (Trial Tr. Vol. 37 at 18 -19.)  The Court considered Odeh's

legitimate charitable work and his level of involvement.  (*Id.*)  Although the Court found Odeh

the least culpable of the five Petitioners, the Court also found Odeh was involved in the

conspiracies and was guilty of the charges.  (*Id.*)  The Court sentenced Odeh to significantly less

time than his statutory exposure, and to less time than any other Petitioner who, like Odeh, was

convicted of more than one count.

Further, on direct appeal defense counsel challenged the terrorism enhancement to Odeh's sentence. The terrorism enhancement resulted in a twelve-level enhancement and automatically increased Odeh's criminal history from category I to category VI. Defense counsel's decision to challenge the terrorism enhancement rather than arguing that Odeh's sentence was unreasonable under *Booker* was within reasonable trial strategy.

### C.    Insufficiency of the Evidence

Odeh claims his appellate counsel was ineffective for failing to argue the evidence was insufficient to convict him of conspiracy.

As discussed above, the evidence against HLF showed that it conspired to aid and support Hamas. Odeh was part of HLF and managed its New Jersey office. A government wiretap captured a conversation between Odeh and El-Mezain in which Odeh spoke approvingly about a Hamas suicide bomb attack. "Odeh referred to the attack as a 'beautiful operation,' and El-Mezain responded, 'May it be good.'" *El Mezain*, 664 F.3d at 529. Also, "[a] June 1996 letter from defendant Odeh to an HLF officer showed that HLF had provided funds used to support the orphaned children of Yehia Ayyash, who was identified as a Hamas engineer and inventor of suicide bombs." *Id.* at 530. Further, in Odeh's office were books about Hamas which identified Ramallah Zakat Committee member Fadel Saleh Hamdan as a ranking Hamas member, and also identified Jamil Hamami as a ranking Hamas leader. In November, 1996 Odeh accepted a donation to the New Jersey HLF office from a donor named Sultan Mahmoud. Mahmoud's donation was accompanied by a letter stating the money was for "relief supplies and weapons to crush the hated enemy," and that "we must destroy Israel." *Id.* at 530. Odeh accepted the

donation and HLF continued to solicit funds from this donor through 1998. *Id.* Also found in

Odeh's office was a book published by the Islamic Association for Palestine that chronicled the

life of Izz El-Din al-Quassam, the namesake of Hamas's military wing. "A list of 'important

addresses' printed by the publisher in the back of the book included HLF's previous address in

Indiana." *Id.* at 531. Also found in Odeh's office in 2001 was a picture from 1990 celebrating

the one-year anniversary of the imprisonment of Hamas founder Sheikh Yassin. *Id.* Odeh has

failed to show that no reasonable juror could have found him guilty based on the evidence

submitted at trial. Odeh has therefore failed to establish that his counsel was ineffective for

failing to raise this claim on appeal.

**D.     Plea Offer**

      Odeh claims his counsel was ineffective for providing incorrect advice and information

regarding the government's plea offer.

      When a petitioner claims his counsel's deficient performance caused him to reject a plea

offer, he must show that,

> but for the ineffective advice of counsel there is a reasonable probability that the plea
> offer would have been presented to the court (i.e. that the defendant would have accepted
> the plea and the prosecution would not have withdrawn it in light of intervening
> circumstances), that the court would have accepted its terms, and that the conviction or
> sentence, or both, under the offers' terms would have been less severe than under the
> judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, ___ U.S. ___, 132 S.Ct. 1376, 1385 (2012).

      Odeh claims the government offered a plea agreement whereby Odeh would plead guilty

to structuring bank deposits and would be sentenced to no more than five years in prison. (Odeh

Affid. at 1) (ECF No. 12). He states his counsel incorrectly told him that his guilty plea would be

used against the other Petitioners at trial. Odeh states counsel informed him that a gag order would prevent him from telling anyone that he did not plead guilty to any of the charges in the indictment, and that jurors and the public would be misled into believing that he pled guilty to the indictment charges. He was also told that any favorable actions he took during the indictment period would not be admissible at trial to help the other Petitioners. Odeh claims that had his counsel not provided this erroneous information, he would have accepted the plea bargain and pled guilty.

The government responds that Odeh did not accept a plea agreement because the government refused to agree to a sentence of six months home confinement. The government submits email correspondence between Odeh's counsel and Assistant United States Attorney Jim Jacks. (Gov. Opp'n Appx. at 22-24.) The emails show that on August 8, 2008, the government offered to allow Odeh to plead guilty to perjury, which Jacks estimated would result in confinement for 8 to 14 months. On August 14, 2008, Odeh's counsel responded that Odeh would agree to plead guilty to one count of perjury in exchange for a sentence of six months home confinement. Jacks rejected the proposal and responded, "That's the same thing we turned down last time." (*Id.*)

The government states that the reference to "last time" refers to the structuring bank deposits plea offer that Odeh discusses in his affidavit. The government states the emails show that Odeh rejected the government's two plea offers because the government would not agree to a sentence of six months home confinement. Additionally, the government notes Odeh does not allege he received ineffective assistance of counsel regarding the later perjury plea offer.

In his reply, Odeh states that an evidentiary hearing is necessary for this claim. "A

motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files and records of the case conclusively show that the prisoner is entitled to no relief." *Bartholomew*, 974 F.2d at 41.  The record in this case shows no evidentiary hearing is necessary.

Odeh's reply does not contest the validity of the government's emails, or the government's claim that the plea offer for perjury was made after the plea offer for structuring bank deposits.  The record also supports the government's claim that the perjury plea offer was the last plea offer made to Petitioner.  Jack's August 8, 2008, email to Odeh's counsel stated the government needed to know by "next Friday," which would have been August 15, 2008, whether Odeh would accept the perjury plea offer,"or there's no point in messing with it."  (Gov. Opp'n Appx. at 22-24.)  Jury selection began on September 4, 2008.  Therefore the perjury plea offer was made just prior to trial.

The emails make clear that Petitioner was willing to plead guilty in exchange for a sentence of six months home confinement.  Therefore, accepting as true Petitioner's allegations that counsel told him his guilty plea would be used against the other Petitioners at trial, that a gag order would prevent him from telling anyone that he did not plead guilty to any of the charges in the indictment, and that any favorable actions he took during the indictment period would not be admissible at trial to help the other Petitioners, this advice did not cause Petitioner to reject the plea offer.  Petitioner rejected the plea offer because the government would not agree to a sentence of six months home confinement.  Thus, Petitioner has failed to establish the required *Strickland* prejudice to sustain his ineffective assistance of counsel claim.  There are no unresolved issues of fact requiring a hearing, and the motion, files and records of the case conclusively establish that Petitioner is entitled to no relief.

### III. Conclusion

For the foregoing reasons, the Court DENIES the motions to correct, vacate or set-aside

sentence pursuant to 28 U.S.C. § 2255.

Signed this 30th day of March, 2015.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE